UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SCOTT JAMES ANDERSON,

                  Petitioner,              Case No. 1:10-cv-349

v.                                  Honorable Robert Holmes Bell

MARY BERGHUIS,

                  Respondent.

_____/

## OPINION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner is serving a term of 15 to 35 years' imprisonment, imposed by the Kalamazoo

County Circuit Court on January 18, 2005, after a jury convicted Petitioner of first-degree home

invasion, MICH. COMP. LAWS § 750.110a(2). In his *pro se* petition, Petitioner raises four grounds

for relief, as follows:

    I.      [PETITIONER] WAS DENIED HIS RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL, UNDER THE SIXTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION AND
SECTION 20, ARTICLE I, MICHIGAN CONSTITUTION 1963, WHERE:
(1) TRIAL COUNSEL'S REPRESENTATION AT THE PRELIMINARY
EXAMINATION WAS A CONSTRUCTIVE DENIAL OF COUNSEL AT
A CRITICAL STAGE; (2) TRIAL COUNSEL WAS CONSTRUCTIVELY
ABSENT DURING THE CRITICAL STAGE BETWEEN THE
PRELIMINARY EXAMINATION AND TRIAL, AND FAILED TO
ADEQUATELY COMMUNICATE WITH [PETITIONER]; (3) TRIAL
COUNSEL FAILED TO IMPEACH AND EFFECTIVELY CROSS-
EXAMINE THE PROSECUTION WITNESSES AT TRIAL WITH THEIR
INNUMERABLE PRIOR INCONSISTENT STATEMENTS TO POLICE
AND THEIR PRELIMINARY EXAMINATION TESTIMONIES;
(4) TRIAL COUNSEL FAILED TO PRESENT [PETITIONER'S]

THEORY/DEFENSE AT TRIAL; (5) TRIAL COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S INTRODUCTION AND COMMENTS REGARDING A LETTER WRITTEN BY [PETITIONER] THAT WAS IRRELEVANT AND HIGHLY PREJUDICIAL; (6) TRIAL COUNSEL PRESENTED INCONSISTENT DEFENSES DURING THE PROSECUTION'S CASE-IN-CHIEF AND DURING COUNSEL'S CLOSING ARGUMENT; (7) TRIAL COUNSEL FAILED TO EMPHASIZE DURING HIS CLOSING ARGUMENT THE PROSECUTION WITNESSES' CONFLICTING TRIAL TESTIMONIES, [PETITIONER]'S ALIBI WITNESS' TESTIMONY AND [PETITIONER]'S MAINTAINING IN THE LETTER THAT THE CHARGES AGAINST HIM WERE FALSE; AND (8) TRIAL COUNSEL'S CUMULATIVE ERRORS FAILED TO SUBJECT THE PROSECUTION'S CASE TO A MEANINGFUL ADVERSARIAL TESTING.

II.  [PETITIONER] WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS APPEAL OF RIGHT, UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SECTION 20, ARTICLE I, MICHIGAN CONSTITUTION 1963, WHERE: (1) APPELLATE COUNSEL INADEQUATELY RAISED CLAIMS; (2) APPELLATE COUNSEL FAILED TO RAISE SUCCESSFUL CLAIMS, OR "DEAD-BANG WINNERS"; (3) APPELLATE COUNSEL FAILED TO MOVE FOR REMAND FOR AN EVIDENTIARY HEARING , AND (4) APPELLATE COUNSEL PERFORMED SO INEFFECTIVELY AND EGREGIOUSLY AS TO AMOUNT TO A CONSTRUCTIVE DENIAL OF COUNSEL AT A CRITICAL STAGE.

III.  [PETITIONER] WAS DENIED HIS RIGHT TO SELF-REPRESENTATION, UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND SECTION 13, ARTICLE I, MICHIGAN CONSTITUTION 1963, WHEN THE TRIAL COURT COMMITTED A STRUCTURAL ERROR BY DENYING [PETITIONER'S] MID-TRIAL REQUEST TO WAIVE COUNSEL AND PROCEED IN PRO PER.

IV.  [PETITIONER] WAS DENIED HIS DUE PROCESS RIGHT TO PRESENT A COMPLETE DEFENSE, UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SECTION[S] 17 AND 20, ARTICLE I, MICHIGAN CONSTITUTION 1963, WHEN THE TRIAL COURT FORCED [PETITIONER] TO CONTINUE THE TRIAL WITH APPOINTED COUNSEL DESPITE [PETITIONER] DEMONSTRATING THAT COUNSEL WAS FAILING

TO EFFECTIVELY CROSS-EXAMINE, IMPEACH AND SHOW THE PROSECUTING WITNESSES' MOTIVES AND BIASES TO TESTIFY FALSELY, THUS DENYING [PETITIONER]'S RIGHT TO A FAIR TRIAL.

Respondent has filed an answer to the petition (docket #9) stating that the grounds should be denied because they are without merit or are procedurally defaulted. Petitioner filed a reply (docket #24). Upon review and applying the AEDPA standards, the Court finds that Petitioner's claims are without merit. Accordingly, the petition will be denied.

## Procedural History

### A.      Trial Court Proceedings

Petitioner was charged with armed robbery and first-degree home invasion arising from an incident that occurred in Kalamazoo County at the residence of the complaining witness, Bruce Ramsdell, during the early morning hours of August 13, 2004. Petitioner was tried before a jury on December 7-8, 2004.

Bruce Ramsdell testified that he leased a house located at 7146 Lover's Lane in Portage, Michigan. (Jury Trial Volume I (Tr. I), 93, 131, docket #14.) In August 2004, Ramsdell had a roommate, Thomas Gormley. (Tr. I, 94.) Angela Kirk and her two children also were staying at Ramsdell's house in mid-August 2004, while Kirk was looking for a place to live. (Tr. I, 94, 131.) Ramsdell testified that he and Petitioner had been friends for about 15 years and Petitioner had been a guest at his home on previous occasions. Gormley also knew Petitioner. (Tr. I, 95.) Ramsdell testified that his friendship with Petitioner was strained in August 2004, because Petitioner started dating Ramsdell's ex-girlfriend, Lisa Babbitt. (Tr. I, 96.)

At approximately 12:45 a.m. on August 13, 2004, Ramsdell was in his living room watching TV when Petitioner and a second man, Otis Belin, kicked-in the back door of his house

and entered the kitchen.  (Tr. I, 97-98.)  Gormley yelled that Scott and Otis were there and then ran

past Ramsdell and out the front door.  (Tr. I, 98-99.)  Ramsdell saw Belin come through the door

first, followed by Petitioner.  Ramsdell testified that Petitioner ran through the kitchen into the living

room and tackled Ramsdell around the waist.  (Tr. I, 100.)  Petitioner began to throw punches and

said things like, "why did you give us up to the cops, you're a snitching bitch."  (Tr. I, 101.)

Ramsdell fought back in self-defense.  (*Id*.)  While Ramsdell was fighting with Petitioner, Belin was

holding Kirk against the wall and threatening her.  (Tr. I, 104.)  Kirk's children were in the back

room and stayed there during the altercation.  (*Id*.)  At one point, Petitioner went to talk to Kirk and

Belin began fighting Ramsdell.  (Tr. I, 106.)  The confrontation lasted about five or six minutes.

Ramsdell testified that when the incident was over, his living room was in shambles

and his wallet had been stolen from his back pocket.  (Tr. I, 105, 107.)  Ramsdell did not know

which one of the men stole his wallet, which contained $705.00.  (Tr. I, 107.)  Petitioner and Belin

left through the back door and Petitioner chased them across his neighbor's back yard before they

ran into an adjacent trailer park.  (Tr. I, 108.)  Kirk tried to call the police on Gormley's cell phone

while the men were in the house, but Belin took it away from her.  (Tr. I, 109.)  After the men left,

Kirk called the police on Ramsdell's cell phone.  (Tr. I, 109-110.)  Ramsdell testified that he initially

was not cooperative with the police because he preferred to handle matters on his own, but ultimately

decided to tell them the truth about what had happened.  (Tr. I, 110-11.)

On cross-examination, defense counsel questioned Ramsdell regarding his ex-

girlfriend, Lisa Babbitt.  Ramsdell testified that he and Babbitt had lived together for almost three

years when he found her and Petitioner in bed together.  (Tr. I, 135-36.) Ramsdell testified that ever

since that incident, he was "pretty much good to be gone with Mr. Anderson [Petitioner] and Ms.

Babbitt." (Tr. I, 136.) He also testified that Petitioner, Belin and Babbitt smoked crack together and that Babbitt lost custody of her kids for smoking crack with her 15-year-old son. (Tr. I, 144.) Petitioner, however, denied that this case was "just about [his] ex-girlfriend." (Tr. I, 125.) Defense counsel also questioned Ramsdell about the $705.00 that he had in his wallet. Ramsdell testified that he earned the money working at Downtown Automotive. (Tr. I, 126-30.) Ramsdell claimed that he did not get a regular paycheck from Downtown Automotive, but was paid after work was completed and he asked the owner to pay him. (*Id*.) He could not recall the date or amount of the last payment from his employer before his wallet was stole. (Tr. I, 127-131.) Ramsdell also made money by doing car repairs at his house and buying and selling cars. (Tr. I, 128-30.)

With regard to the incident at his home, Ramsdell testified on cross-examination that he did not see the back door get kicked in and did not actually see the men coming through the door because he was in the living room. (Tr. I, 133-35.) Ramsdell agreed that Gormley could have opened the door for Petitioner and Belin, and if he had, that could have been an invitation for the men to enter the house. (Tr. I, 135.) Ramsdell testified that he did not see who took his wallet, but he felt it being pulled out of his pocket while he was being punched in the face. (Tr. I, 142-43.) At the time his wallet was taken, both men were assaulting him at the same time. (Tr. I, 152-53.) The men left 20 or 30 seconds after his wallet was taken. (Tr. I, 143.) Ramsdell rejected the possibility that the wallet could have fallen out of his pocket during the altercation. (Tr. I, 142-43.) Ramsdell further testified that he found a steak knife on the floor in the area where Belin was holding Kirk. According to Petitioner, the knife was part of a set that he acquired while he was living with Babbitt on Hays Park. (Tr. I, 148.) Babbitt took the set when she moved to Miller Road. (Tr. I, 149.) Ramsdell was not threatened with the knife. Ramsdell testified that he never was given the

opportunity to provide a written statement to the police. (Tr. I, 150.) Ramsdell admitted to talking with Gormley and Kirk about what happened that night, but denied comparing each other's versions of the events. (Tr. I, 148.) He also had reviewed his preliminary examination testimony and statement to the police before he came to testify at trial. (Tr. I, 137.)

Angela Kirk testified that she was staying with Ramsdell on August 13, 2004. (Tr. I, 154.) Prior to that, she had a relationship with Petitioner. The relationship ended about a month earlier and resulted in hard feelings. (Tr. I, 155.) After her relationship with Petitioner ended, Ramsdell let Kirk and her three children stay with him. (Tr. I, 155.) Kirk was not involved in a romantic relationship with Ramsdell or Gormley. (Tr. I, 156.) Kirk was in the living room watching TV when the dog starting acting funny, so Gormley took him outside. (Tr. I, 156-57.) Gormley ran back in the house and told Kirk that someone was in the back yard, and he thought it was Scott and Otis. (Tr. I, 157.) Kirk then heard "slamming and banging" coming from the back of the house and Petitioner and Belin appeared. (Tr. I, 157-58.) Kirk immediately tried to get a telephone to call 911 because the men had broken into the house. Kirk was afraid for herself and her children. (Tr. I, 158.) Belin cornered Kirk and held a knife to her throat with one hand and took the phone away from her with his other hand. (Tr. I, 159.) Belin released Kirk after he got the phone away from her and she ran into the kitchen to find another phone. Petitioner came after her and held a lead pipe over her head. (Tr. I, 159-60, 163.) According to Kirk, Petitioner was yelling profanities at her and seemed to be on a "big adrenaline rush." (Tr. I, 160.) Kirk ran to the neighbor's house while she was trying to call 911. The neighbor did not answer, so she hid behind a car and waited for police. (Tr. I, 161.) Kirk testified that she had a bruise on her arm and some scratches on her neck from the knife, but did not go to the hospital for treatment. (Tr. I, 161-62.)

On cross-examination, Kirk testified that she could not see the door, but she heard the sound of it being kicked in and slamming against the wall. (Tr. I, 166-67.) Kirk initially testified that she could hear commotion and hitting while Belin was holding her, but she could not see Petitioner and Ramsdell. (Tr. I, 164-65.) Kirk then added that she glanced over for half a second and saw Ramsdell being shoved into the corner. (Tr. I, 165.) Kirk admitted that was the first time she recalled seeing Ramsdell during the alleged assault. (Tr. I, 165.) The last time Kirk saw Ramsdell's wallet, it was in his back pocket. She never heard anyone demand money and did not know if the wallet fell out of Ramsdell's pocket during the fight. (Tr. I, 170.) Kirk admitted to having hard feeling toward Petitioner, but denied that she would come to court and lie. (Tr. I, 168, 172.)

On the morning of the second day of trial, Petitioner requested to proceed in pro per because he was dissatisfied with trial counsel's performance. (Jury Trial Volume 2 (Tr. II), 175-195, docket #15.) Among other things, Petitioner complained that counsel was not doing an adequate job impeaching the witnesses with the many inconsistencies in their statements to police and preliminary examination testimony. Petitioner also argued that counsel was not sufficiently developing evidence that the witnesses were "liars and dope fiends and drug dealers" who had a vendetta against him. (Tr. II, 179.) The trial court concluded that Petitioner's request was not unequivocal and that he did not fully understand the advantages and disadvantage of self-representation. (Tr. II, 194.) In addition, the court found that the commencement of self-representation in the middle of trial would be an undue inconvenience and burden on the court. (*Id*.) The court further noted that defense counsel's cross-examination of the prosecutorial witnesses the previous day was "appropriate and thorough." (Tr. II, 195.) Accordingly, the court denied Petitioner's request for self-representation.

When the trial resumed, Thomas Gormley testified that he and Petitioner rented a two-bedroom house together in August 2004. (Tr. II, 198.) Gormley had been acquainted with Petitioner for about a year and Petitioner had been invited to their house on previous occasions. (Tr II, 196-97.) Gormley testified that he, Ramsdell, Kirk and her three children were at the house on the night of August 13, 2004. (Tr. II, 198.) Gormley and Kirk were watching television around 12:30 or 12:45 a.m. when they noticed that the dog was acting strange. (Tr. II, 199.) Gormley and Ramsdell took the dog outside because they thought there was something out there. The dog was attached to a chain. After Ramsdell went back in the house, the dog started barking and Gormley saw Petitioner coming through the fence line with an orange pipe, followed by Mr. Belin. (Tr. II, 201.) The pipe was approximately three feet long and looked like it came from a floor jack. (Tr. II, 205.) Gormley was afraid of being assaulted and ran into the house, locking the door behind him. (Tr. II, 202, 205-06.) Gormley ran through the house to tell Ramsdell that Petitioner and Belin were coming and continued out through the front door. (Tr. II, 203.) As he was moving through the house, Gormley could hear a crash coming from the back of the house. (Tr. II, 206.) Gormley went to the trailer park adjacent to the house and started knocking on doors to get help. (Tr. II, 207.) No one answered, but Gormley started to hear police sirens and returned to the house when the police arrived on the scene. (Tr. II, 207.) When Gormley went back in the house, he saw damage to the back door and glass window pane, as well as marks on the walls. Gormley's phone was missing after the incident and was never recovered. (Tr. II, 109.)

On cross-examination, Gormley testified that the glass pane came out of the back door, but he was not sure if it actually was broken. (Tr. II, 210.) Gormley gave a verbal statement to the police following the incident, but was not asked to give a written statement. Gormley admitted

that he did not initially tell the police about the orange pipe.  (Tr. II, 212.)  According to Gormley, Ramsdell had gone back in the house before Petitioner approached with the pipe.  (Tr. II, 219.) Gormley testified that he was afraid and ran backward through the house to get away from Petitioner and Belin, but stopped to close and lock the back door.  (Tr. II, 213-15.)  Gormley testified that Petitioner had been welcome at the house in the past.  (Tr. II, 216.)

Scott Edgerly testified that he was staying at Ramsdell's house on August 13, 2004, with his mother and two siblings.  (Tr. II, 224.)  Edgerly, who was sleeping in one of the bedrooms with his brother, testified that awoke to the sound of voices.  He could hear his mother and Ramsdell screaming and yelling at someone.  (Tr. II, 225, 227.)  Edgerly was familiar with Petitioner, but did not hear his voice.  (Tr. II, 226.)  Edgerly was afraid and stayed in the bedroom until after the incident had ended.  (Tr. II, 226-27.)  When he came out, things were tipped over and the mirror had fallen off the wall.  (Tr. II, 226.)  On cross-examination, Edgerly testified that he did not hear any crashing or anything that sounded like a door breaking open or a window falling out.  (Tr. II, 228.)

Portage Police Officer Kevin Gleesing testified that he was dispatched to Ramsdell's residence on August 13, 2004 at approximately 12:30 or 12:45 p.m.  (Tr. II, 229.)  Officer May, who was the first responder, was in the driveway talking with the three witnesses.  (Tr. II, 231.)  The back door had a footprint on the outside and was standing open.  The window from the upper half of the door was laying on the floor, but the panes of glass were not broken.  (Tr. II, 231, 236.)  Gleesing noticed that some things were knocked over in the living room and there was a big gouge in the drywall, which looked like it could have been made with a pipe.  (Tr. II, 232.)  Gleesing spoke to Mr. Ramsdell, who had several bruises and abrasions on his face that were consistent with being punched or slapped.  (Tr. II, 233.)  Gleesing did not speak with Kirk and could not recall her injuries.  (*Id*.)

- 9 -

Officers found two sets of footprints leading from the back of the residence, but were unable to locate any suspects that night.  (Tr. II, 233-38.)

After the prosecution rested, defense counsel moved for a directed verdict of acquittal, which was denied by the trial court.  (Tr. II, 239-50.)

The defense called Rodney Milan, Bruce Ramsdell's cousin, as an alibi witness. Milan testified that he met Petitioner through Ramsdell about thirteen years ago.  (Tr. II, 252.)  Milan and Petitioner were drinking together at Milan's house on the night of August 12 into the morning of August 13, 2004, which was Friday the 13th.  (Tr. II, 253.)  They started drinking around 10:00 p.m. and continued until about 1:00 a.m.  (Tr. II, 258.)  Milan passed out and Petitioner was gone when he woke up.  Petitioner was living with Milan at the time, so Milan assumed that he had gone out to the store to get something to eat.  (Tr. II, 254.)  After Petitioner was charged in this case, he called Milan frantically from jail and told Milan that he needed to talk to him immediately.  (Tr. II, 253.)  Milan visited Petitioner in jail on two occasions.  (Tr. II, 259.)  Milan did not believe that Petitioner committed the charged offenses because they were together at Milan's house at the time the incident allegedly occurred.  (Tr. II, 255.)  Milan admitted that he was drunk that evening.  (Tr. II, 257.)  Milan did not inform the police that Petitioner was with him at the time of the alleged incident, but he did tell Petitioner's attorney.  (Tr. II, 259-61.)

Petitioner testified that the charges against him were a "total fabrication."  (Tr. II, 262.)  Petitioner claimed that he was with Milan on the night of August 12-13, and that Ramsdell, Kirk and Gormley filed false police reports because they had a vendetta against him.  (Tr. II, 262-633, 266.)  On cross-examination, Petitioner admitted to writing letters to Ramsdell since the incident giving rise to the charges against him.  (Tr. II, 263-64.)  In one of the letters, Petitioner

- 10 -

suggested that Ramsdell "just not show up for the preliminary exam and that this shit could have been all over." (Tr. II, 264.) Petitioner also admitted to stating in the letter, "[A]ll you have to do is to get a hold of the prosecutor - our mutual enemy - tell her that the word on the street is that there was someone who looked like me and that possibility a mistake had been made." (Tr. II, 265.) According to Petitioner, Ramsdell was worried about getting in trouble for making a false police report. (*Id*.) Alternatively, Petitioner suggested in the letter that Ramsdell "be a bad witness on the stand" so that the jury could not find Petitioner guilty beyond a reasonable doubt. (*Id*.) Petitioner explained at trial that he was not asking Ramsdell to lie for him, but wanted to make sure that Ramsdell knew his options because Petitioner had heard from friends that Ramsdell did not want him locked up for a long period of time. (Tr. II, 265, 268.)

At the conclusion of trial, the jury found Petitioner not guilty of armed or unarmed robbery, but guilty of first-degree home invasion. (Tr. II, 314.) On January 18, 2005, the trial court sentenced Petitioner as a fourth habitual offender to imprisonment of 15 to 35 years. (Sentencing Transcript, (S. Tr.), 11-12, docket #25.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. The brief filed by Petitioner's appointed appellate counsel raised the following claims of error:

I.    DEFENDANT-APPELLANT IS ENTITLED TO A NEW TRIAL WHERE THE TRIAL COURT DENIED APPELLANT'S REQUEST FOR SELF REPRESENTATION.

II.   DEFENDANT-APPELLANT IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.[1]

---

[1]Petitioner asserted that counsel was ineffective for not properly questioning the witnesses regarding their motives for fabricating the charges against Petitioner.

(*See* Def.-Appellant's Br. on Appeal, docket #26.)  Petitioner filed a *pro se* supplemental brief, which included the two claims raised by appellate counsel, as well as a third claim:

> III.    DEFENDANT-APPELLANT IS ENTITLED TO A NEW TRIAL WHERE [THE] TRIAL COURT DEPRIVED DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION.

By unpublished opinion issued on July 20, 2006, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 7/20/06 Mich. Ct. App. Opinion (MCOA Op.), docket #19.)

Petitioner filed a pro se application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals.  By order entered January 29, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 1/29/07 Mich. Ord., docket #20.)

## C.    Post-conviction relief

On January 30, 2008, Petitioner filed a motion for relief from judgment in the Kalamazoo County Circuit Court raising his first, second and fourth grounds for habeas corpus relief. The trial court issued an order on February 27, 2008, denying Petitioner's motion under M.C.R. 6.508(D).  The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's applications for leave to appeal on April 10, 2009 and January 29, 2010, respectively, for failure to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D).

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  The Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  "In *Greene*, the Court clarified that state courts must follow clearly established law as it existed 'at the time of the state-court adjudication on the merits.'" *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014).  "That is, under 28 U.S.C. § 2254(d), 'clearly established Federal law' is the law at the time the original decision was made, not as [the Sixth Circuit had previously held], the law 'before the conviction became final.'"  *Miller*, 642 F.3d at 644 (quoting *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth by the Supreme Court, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.

- 13 -

*Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–406). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011)).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Richter*, 131 S. Ct. at 784; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be

overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## Discussion

I.      **Ineffective Assistance of Trial Counsel**

In his first ground for habeas corpus relief, Petitioner raises several alleged instances of ineffective assistance of trial counsel.[2]  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

---

[2]Respondent maintains that the majority of Petitioner's claims of ineffective assistance of trial counsel are procedurally defaulted because they were not raised on direct appeal.  Petitioner contends that the failure to raise those claims on direct appeal was the result of ineffective assistance of appellate counsel.  "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review."  *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010).  Nevertheless, the Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson*, 351 F.3d at 215-16 ; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Petitioner argues that his claims first two claims of ineffective assistance of counsel fall under *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court held that the denial of counsel during a critical stage of the proceeding amounts to a per se denial of the effective assistance of counsel. *See Cronic*, 466 U.S. at 659. In *Bell*, 535 U.S. 685, the Supreme Court defined the differences between claims governed by *Strickland* and claims governed by *Cronic*. If a claim is governed by *Strickland*, a defendant typically must demonstrate that specific errors made by trial counsel affected the ability of the defendant to receive a fair trial. If a claim is governed by *Cronic*, however, the defendant need not demonstrate any prejudice resulting from the lack of effective counsel. *See Mitchell v. Mason*, 325 F.3d 732, 741 (6th Cir. 2003) (citing *Bell*, 535 U.S. at 695). Three types of cases warrant the presumption of prejudice: (1) when the accused is denied the presence of counsel at a critical stage; (2) when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Mitchell*, 325 F.3d at 742 (*quoting Bell*, 535 U.S. at 695).

- 16 -

A.     Constructive Denial of Counsel at the Preliminary Examination

Relying on *Cronic*, Petitioner contends that trial counsel's representation at the preliminary examination amounted to denial of counsel at a critical stage of the proceedings. Petitioner claims that Mr. Svikis was appointed to represent him one week before the preliminary examination, but did not meet with Petitioner for the first time until an hour before the preliminary examination. During the meeting, Petitioner informed Mr. Svikis that the charges were false and that the witnesses had a motive to lie. Petitioner claims that Mr. Svikis was ineffective for failing to thoroughly cross-examine Ramsdell, Kirk and Gormley at the preliminary examination with inconsistencies in their statements to police. Petitioner further contends that, in light of the gross inconsistencies in the witnesses' statements, counsel should have pressed for dismissal of the charges. Petitioner argues that counsel's inadequate performance qualified as a constructive absence of counsel at a critical stage, thereby resulting in a presumption of prejudice.

Contrary to Petitioner's assertions, the circumstances presented here do not qualify as a structural error under *Cronic*. Counsel met with Petitioner in advance of the preliminary examination, was present at the preliminary examination and cross-examined the witnesses. Petitioner may believe that his counsel's performance could have been more aggressive, but such a situation does not qualify as a lawyer who "fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. Counsel's performance is readily distinguishable from situations where ineffective assistance has been presumed. *See, e.g., Rickman v. Bell*, 131 F.3d 1150, 1156-60 (6th Cir. 1997) (holding that *Cronic* applied where defense counsel "combined a total failure to actively advocate his client's cause with repeated expressions of contempt for his client for his alleged actions"); *Martin v. Rose*, 744 F.2d 1245, 1250-51 (6th Cir. 1984) (holding that

- 17 -

defense counsel's "total lack of participation deprived Martin of effective assistance of counsel at trial as thoroughly as if he had been absent," thereby violating Martin's Sixth Amendment rights).

Several circuits have drawn the distinction between *Cronic*'s per se rule and *Strickland*'s requirement of deficient performance and prejudice in terms of whether defense counsel provided no representation at all versus bad, even deplorable assistance. *See, e.g., Glover v. Miro*, 262 F.3d 268, 276-77 (4th Cir. 2001) (holding that *Cronic* did not apply, noting that "[t]his case is not one where the lawyer literally sleeps through the State's case or otherwise might as well be absent"); *Childress v. Johnson*, 103 F.3d 1221, 1229-30 (6th Cir. 1997) (noting that "we have consistently distinguished shoddy representation from no defense at all"); *Scarpa v. DuBois*, 38 F.3d 1, 12-15 (1st Cir. 1994) (distinguishing "maladroit performance" from "non-performance," and holding that " *Strickland* controls inquiries concerning counsel's actual performance at trial, and that substandard performance, in the nature of particular attorney errors, cannot conclusively be presumed to have been prejudicial").

The Sixth Circuit has applied *Cronic* only where the constructive denial of counsel and the associated collapse of the adversarial system is imminently clear. *Compare Rickman*, 131 F.3d at 1156-60 (holding that defense counsel's performance amounted to the constructive denial of counsel because his hostility towards his client at trial "succeeded in presenting a terrifying image of Rickman, and thereby aligned [defense counsel] with the prosecution against his own client"), *with Muniz v. Smith*, 647 F.3d 619, 624-25 (6th Cir. 2011) (state court's application of the two-part *Stickland* test, rather than the presumed prejudice standard under *Cronic*, was not unreasonable where defense counsel was only asleep for an undetermined portion of a single, fairly short cross-examination), *and Moss v. Hofbauer*, 286 F.3d 851, 861 (6th Cir. 2002) (defense counsel's

alleged errors, in failing to make opening statement or to cross-examine government's two key eyewitnesses, did not rise to level of a constructive denial of counsel, and could support ineffective-assistance claim only upon showing of prejudice, where defense counsel had actively represented defendant during proceedings, and articulated strategic reasons for not cross-examining two witnesses in question).  In *Burgess v. Booker*, 526 F. App'x 416, 433 (6th Cir. 2013), the Sixth Circuit rejected a claim that the petitioner was denied counsel during a critical stage of the proceedings for failing to thoroughly cross-examine a key witness at the preliminary examination due to the fact that counsel was given insufficient time to prepare.  Under these authorities, trial counsel's performance at Petitioner's preliminary examination clearly did not amount to the denial of counsel at a critical stage of the proceedings.

Because *Cronic*'s presumed prejudice is inapplicable here, Petitioner is required to demonstrate both prongs of the *Strickland* analysis in order to establish ineffective assistance of counsel.  Defense counsel's decision not to aggressively cross-examine the witnesses at the preliminary examination constitutes reasonable trial strategy.  *See Vasquez v. Jones*, 496 F.3d 564, 578 (6th Cir. 2007) ("[E]schewing cross-examination at the preliminary examination stage is a reasonable strategy.  Extensive questioning would tip the prosecution to the weaknesses in its case, but not likely prevent the defendant from being prosecuted because the state need only show probable cause.) Because of the wide latitude afforded counsel in developing trial strategy, this court is reluctant to second-guess tactical decisions.  *Strickland*, 466 U.S. at 689.  Petitioner, therefore, cannot show that counsel's performance fell below an objective standard of reasonableness.  Moreover, Petitioner cannot show prejudice because the evidence at the preliminary examination was more than sufficient to provide probable cause to support a bind over on the charges.  Petitioner,

therefore, is not entitled to habeas corpus relief arising from counsel's performance at the preliminary examination.

B.     Constructive Denial of Counsel During Pre-Trial Period

Petitioner contends that he was denied the effective assistance of counsel during a critical stage of the proceedings when trial counsel was constructively absent between the preliminary examination and trial.  It is well accepted that the "pre-trial period" constitutes a "critical period" for purposes of the *Cronic* analysis because it is during the pre-trial period that counsel is obligated to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Mitchell*, 325 F.3d at 743.  Naturally, if counsel fails to consult with the client during the critical pre-trial periods, he cannot fulfil his duty to reasonably investigate matters.  *Id.*  Petitioner relies on the Sixth Circuit's decision in *Mitchell*, where the Sixth Circuit granted habeas corpus relief to a Michigan prisoner whose counsel was suspended from practice for the entire month preceding trial, never interviewed the petitioner before trial, failed to respond to the petitioner's letters, failed to respond to the petitioner's mother's letters, failed to appear at the hearing on the petitioner's "motion for withdrawal of counsel" and failed to speak with or call witnesses to the events underlying the charge of first-degree murder.  The Sixth Circuit also noted that during the entire course of defense counsel's seven month representation, he met with the petitioner for a total of six minutes.  *Mitchell*, 325 F.3d at 746–48.  The court concluded that the combination of circumstances resulted in a complete denial of counsel during the critical pretrial investigation phase.  *Id*. at 741.

*Mitchell* is a case involving unique facts - a complete failure to consult, investigate and prepare for trial combined with counsel's suspension from the practice of law immediately prior

- 20 -

to trial - and its holding is limited to those unique facts. Unlike the circumstances in *Mitchell*, there is no evidence that Mr. Svikis was suspended from the practice of law at any point during his representation of Petitioner. While Petitioner contends that he only spoke with counsel on three occasions for a total of 7-11 minutes before his trial began, the record does not demonstrate a complete failure to consult, investigate and prepare for trial. Petitioner's counsel was appointed to, and met with, Petitioner before the preliminary examination. As discussed in the previous section, counsel represented Petitioner at the preliminary examination and cross-examined the prosecutorial witnesses. Counsel also met with Petitioner before the pre-trial hearing and before trial, albeit for shorts periods of time. Further, unlike *Mitchell*, where the petitioner repeatedly asked the court for new counsel because his current lawyer refused to meet with him, Petitioner did not request a different lawyer or alert the trial court to any problems with Mr. Svikis before the commencement of trial.

Finally, unlike *Mitchell*, that record shows that counsel made at least some attempt to investigate the case and prepare for trial. According to the state court docket record (docket #12), counsel engaged in a variety of pre-trial activities, including a response to the prosecutor's request for discovery and a request to the prosecutor for criminal history information (docket #1-2, Page ID#25), a pre-trial conference, the filling of a notice of alibi defense (docket #1-2, Page ID#52) and a settlement conference. Mr. Svikis also negotiated a plea agreement in advance of trial, which was rejected by Petitioner. On the day of trial counsel presented a second plea agreement whereby Petitioner would plead guilty as a second habitual offender to unarmed robbery in exchange for the dismissal of the remaining charges with a sentence agreement of 5 to 30 years. (Tr. I, 4-5.) Petitioner informed the trial court that he did not wish to take the plea deal because he was innocent.

(Tr. I, 5.)  Petitioner stated that he had not discussed "the entire case" with defense counsel (Tr. I, 5), but did not express dissatisfaction with counsel.

In this case, counsel's representation during the pre-trial phase far surpassed the representation by counsel in *Mitchell*, which was found by the Sixth Circuit to warrant *Cronic* review.  *See Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. 2007) (recognizing that *Mitchell* rested on the fact that the defendant was denied the presence of counsel during the critical stages because counsel was suspended from practice during the entire month preceding trial).  As a consequence, Petitioner is not entitled to a presumption of prejudice under *Cronic*.

Applying *Strickland*, the Court cannot find that counsel's pre-trial performance, as described above, fell below an objective standard of reasonableness.  Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice.  *See Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004).

C.    Failure to Impeach and Effectively Cross-Examine Witnesses

Petitioner contends that trial counsel failed to impeach and effectively cross-examine the prosecutorial witnesses at trial with their innumerable prior inconsistent statements at the preliminary examination and in their statements to police.  Petitioner contends that as a result of counsel's failure to properly cross-examine and impeach the witnesses, their motives for fabricating the charges against him were not adequately presented to the jury.

Applying the *Strickland* standard, the Michigan Court of Appeals rejected Petitioner's claim, stating:

> Next, defendant argues that he was denied the effective assistance of counsel because defense counsel failed to properly attack the accusing witnesses' credibility by failing to properly question the witnesses about their motives to fabricate the

- 22 -

charges. The denial of effective assistance of counsel is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Questions of fact are reviewed for clear error, and questions of law are reviewed de novo. *Id.* Our review is limited to mistakes apparent on the record because no *Ginther* hearing was held. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000). To establish ineffective assistance, a defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness, and he was prejudiced by the representation. *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). With respect to prejudice, the defendant must demonstrate a reasonable probability that the result of the proceedings would have been different had it not been for counsel's errors. *Id.* at 312, 326-327.

A defendant must also overcome the strong presumption that counsel's performance was sound trial strategy. *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001). The decision to call or question witnesses is presumed to be a matter of trial strategy. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). The failure to question a witness or present other evidence is considered ineffective assistance of counsel only when it denies the defendant a substantial defense. *Id.* The record indicates that through his cross-examination and argument, defense counsel vigorously asserted the defense strategy at trial. Defendant has not established that defense counsel's performance fell below an objective standard of reasonableness. *Pickens, supra* at 302-303. We will not substitute our judgment for that of defense counsel regarding trial strategy matters, nor will we evaluate counsel's competence with the benefit of hindsight. *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004). Furthermore, we note that defendant is unable to establish prejudice because substantial evidence of defendant's guilt was presented at trial. Therefore, any failure to further cross-examine witnesses did not deprive defendant of a substantial defense or affect the outcome of the trial. *Pickens, supra*.

(MCOA Op. 3) (footnote omitted).

Defense counsel's decisions regarding cross-examination are matters of trial strategy, which are entitled to "great respect" by this Court. *Glenn v. Sowders*, No. 85-5754, 1986 WL 18475, at *4 (6th Cir. 1986) (quoting *United States v. Clayborne*, 509 F.2d 473, 479 (D.C. Cir. 1974)); *see also Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."). Most cross-examinations can be improved but if that "were the standard of constitutional

effectiveness, few would be the counsel whose performance [pass] muster." *Id.* (quoting *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996)); *see also Jackson v. Bradshaw*, 681 F3d 753, 765 (6th Cir. 2012) (Defense counsel did not perform ineffectively by not more forcefully pressing witness on the issue of her possible bias she may have harbored against defendant, particularly when the effect of further probing was speculative).  Impeachment strategy also is a matter of trial tactics and such decisions are not ineffective "simply because in retrospect better tactics may have been available." *Henderson*, 118 F.3d at 1287; *see also Dell v. Straub*, 194 F. Supp.2d 629, 651 (E.D. Mich. 2002).

Here, as the court of appeals observed, Mr. Svikis vigorously asserted throughout his arguments and cross-examination that the charges were based on false allegations.  During his opening statement, defense counsel clearly articulated the defense theory of the case - that Ramsdell had a vendetta against Petitioner and fabricated the incident as payback for Petitioner sleeping with Ramsdell's girlfriend, Lisa Babbitt.

> This case will demonstrate to what extent an individual will go for paybacks.  This is a case about a vendetta, and it's particularly over a girlfriend.  It's a girlfriend that complaining witness had that he found when he returned to one of his apartments where he was no longer living - found Mr. Anderson [Petitioner] in bed with.  This is a case about a fabricated story that will not hold together.

(Tr. I, 90.)  Defense counsel pursued this theory on cross-examination when he elicited testimony from Ramsdell that he and Lisa Babbitt had lived together for almost three years when he found her and Petitioner in bed together.  (Tr. I, 135-36.)  Ramsdell testified that ever since that incident, he was "pretty much good to be gone with Mr. Anderson [Petitioner] and Ms. Babbitt."  (Tr. I, 136.)  In addition, defense counsel elicited testimony from Angela Kirk, Petitioner's ex-girlfriend, that she also had hard feelings toward Petitioner, although she denied that she would come into court and lie.  (Tr. I, 168, 172.)

- 24 -

Moreover, throughout cross-examination, defense counsel highlighted *material* inconsistencies between the witnesses' testimony at trial and their previous statements to police and at the preliminary examination. For example, counsel elicited testimony from Gormley on cross-examination that he did not initially tell the police that Petitioner was carrying an orange pipe. (Tr. II, 212.) Whether Petitioner possessed a pipe was highly relevant to the armed robbery charge, for which Petitioner ultimately was acquitted. Although Petitioner contends that Mr. Svikis should have been more thorough in pointing out inconsistencies in the witnesses' statements and testimony, the mere fact that other avenues of impeachment may have existed does not render counsel ineffective; counsel need not "develop every bit of testimony through all available inconsistent statements." *Poyner v. Iowa*, 990 F.2d 435, 438 (8th Cir. 1993); *see also United States v. Kozinski*, 16 F.3d 795, 817 (7th Cir. 1994) (counsel not ineffective where counsel could have elicited additional impeachment information on cross-examination). Pointing out each and every inconsistency in the witnesses' statements, particularly on points that were not material to the charged offenses, would have been an unnecessary annoyance and burden on the court and the jury. In light of the great deference given to counsel's judgment in matters of cross-examination and impeachment, Petitioner has failed to show that counsel's performance was deficient, much less that the decision of the Michigan Court of Appeals was an unreasonable application of *Strickland* as required by § 2254(d)(1).

### D. Failure to Present Petitioner's Theory/Defense at Trial

Petitioner contends that defense counsel failed to call Officer May to testify regarding Kirk and Gormley's police statements, which were inconsistent with their testimony at the preliminary examination and at trial. Specifically, Petitioner contends that the police report indicated

that Kirk told Officer May that Petitioner approached her and yelled, "You're going to get fucked up."  However, at the preliminary examination, Kirk testified that "Mr. Anderson had me cornered . . . threatening to beat me and kill me with a metal pipe."  (Preliminary Examination (PE), 21, docket #13.)  Likewise, Petitioner asserts that counsel should have called Officer May to testify that Gormley did not say anything to him about a pipe to impeach Gormley's preliminary examination testimony that  Petitioner had an orange bar that looked like a jack handle.  Petitioner further argues that counsel failed to expose the witnesses' motives and biases by offering evidence of Ramsdell's drug-related felony convictions to show that he was a drug dealer, which gave him power over Gormley and Kirk, who were addicts.  Likewise, Petitioner argues that counsel was ineffective for not offering evidence of Gormley's 1997 felony drug conviction to show his addiction, and, thus, his motive to lie for Ramsdell.

Decisions as to what evidence to present and whether to call or question witnesses are presumed to be a matter of trial strategy, and the failure to call witnesses or present other evidence can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense.  *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004).  Petitioner was not denied a substantial defense by trial counsel's decision not to call Officer May as a witness.  As previously discussed, defense counsel elicited testimony from Gormley on cross-examination that he did not mention the pipe to the police.  (Tr. II, 212.)  Consequently, counsel successfully impeached Gormley on the issue of the alleged weapon without calling Officer May.  Any further testimony from Officer May on that point would have been unnecessarily cumulative.  With regard to Kirk, defense counsel elicited her testimony that she did not see Petitioner do anything to Ramsdell. (Tr. I, 164-65.)  Moreover, evidence regarding the pipe was relevant to the armed robbery charge for which Petitioner was acquitted.  Petitioner, therefore, cannot show prejudice from

counsel's alleged failure to sufficiently impeach the witnesses regarding the inconsistencies in their statements and testimony concerning the pipe.

Similarly, Petitioner was not denied a substantial defense by counsel's alleged failure to offer evidence of Ramsdell and Gormley's drug-related felony convictions.   Contrary to Petitioner's assertions, evidence of those convictions was not admissible at trial.   Michigan Rule of Evidence 609 provides that impeachment of a witness by evidence of conviction of crime is not admissible unless the crime contained an element of dishonesty or false statement, or an element of theft.   MRE 609(a)(1)-(2).   A conviction for a drug offense does not meet this requirement.   While counsel could not directly offer evidence of Ramsdell's drug-related activities, he extensively cross-examined Ramsdell regarding the origin of the relatively large amount of cash that was in his wallet when it allegedly was stolen by Petitioner and Belin.   (Tr. I, 126-30.)   In sum,  Petitioner has failed to show that counsel's performance fell below an objective standard of reasonableness.

E.   Failure to object to the introduction of the letter written by Petitioner to Ramsdell

Petitioner argues that his trial counsel was ineffective for failing to object to the admission of a letter written by Petitioner to Ramsdell after the charges in this case were brought. According to Petitioner, the evidence was inadmissible because it was irrelevant and any probative value was outweighed by the danger of unfair prejudice due to the letter's "anti-authority" tone. Throughout the letter, Petitioner used profanity and referred to the prosecution as the "enemy" and "bitches."[3]  Petitioner also asserts that counsel provided constitutionally deficient assistance when, during closing arguments, he failed to tell the jury how to interpret the letter and did not to object to the prosecutor's rebuttal argument regarding the letter.

---

[3]A copy of the letter was submitted with the petition as Exhibit 9 (docket #1-2, Page ID#30-35).

The prosecutor first raised the letter during her cross-examination of Petitioner.  (Tr. II, 264.)  Petitioner admitted to suggesting in the letter that Ramsdell "just not show up for the preliminary exam and that this shit could have been all over." (Tr. II, 264.)  Petitioner also admitted to stating in the letter, "[A]ll you have to do is to get a hold of the prosecutor - our mutual enemy - tell her that the word on the street is that there was someone who looked like me and that possibility a mistake had been made." (Tr. II, 265.)  Petitioner further suggested in the letter that Ramsdell "be a bad witness on the stand" so that the jury could not find Petitioner guilty beyond a reasonable doubt.  (*Id*.)  In addition, Petitioner gave Ramsdell the name of the prosecutor assigned to the case so that he could contact her directly.  (*Id*.)  Petitioner explained that he made those suggestions because he believed that Ramsdell was worried about getting in trouble for making a false police report.  (*Id*.)  Mr. Svikis asked for the letter to be admitted as evidence so that the jury could review the entire document, not just the portions referenced by the prosecutor.  (Tr. II, 264.)  On redirect, defense counsel also provided Petitioner an opportunity to explain that he was not asking Ramsdell to lie for him, but was trying to help both of them get out of a jam because Ramsdell had filed a false police report.  (Tr. II, 268.)

The prosecutor did not mention Petitioner's letter to Ramsdell during the initial portion of her closing argument.  Defense counsel briefly mentioned the letter during his closing argument and suggested that the jurors could read it and interpret it for themselves.  (Tr. II, 286.)  On rebuttal, when defense counsel would not have the opportunity to respond further, the prosecutor made extensive references to the letter and concluded by saying: "Is this a desperate man, a man that's trying to do everything he could to try to encourage Bruce Ramsdell not to come into court to testify regarding the events?  I would submit to you that's exactly what we have here." (Tr. II, 293.)

Contrary to his assertions, Petitioner's attempt to influence Ramsdell to get the charges against Plaintiff dismissed by not showing up for the preliminary examination or by being a bad witness or by telling the prosecutor that he made a mistake, undoubtedly was relevant and admissible at trial to demonstrate Petitioner's consciousness of guilt. *See People v. Schaw*, 791 N.W.2d 743, 746 (Mich. Ct. App. 2010) (evidence that a defendant made efforts to influence an adverse witness is relevant if it shows consciousness of guilt). Further, the evidence was not unfairly prejudicial. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" MRE 403. "In this context, prejudice means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion." *Schaw*, 791 N.W.2d at 747 (quotation marks and citation omitted). Instead, evidence is considered "unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v. Crawford,* 582 N.W.2d 785, 796 (Mich. 1998). In this case, Petitioner's attempt to influence the complaining witness to get the charges dismissed was not marginally probative, but pertained directly to the issue if Petitioner's guilt.

Because the letter was admissible under Michigan law, any objection by defense counsel to the prosecutor's use of the letter would likely have been overruled. The failure to make a frivolous or meritless objection does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden*, 92 F. App'x at 311. Defense counsel gave Petitioner the opportunity on redirect to explain his motivation for writing the letter and tell the jury that he was not asking Ramsdell to lie. Moreover, defense counsel gave the jury the opportunity to review the entire letter. As noted

by Petitioner, he did not admit to the charged conduct in the letter and referred to the charges against him as false.  Counsel, therefore, was not ineffective for not objecting to the admission of the letter.

Moreover, the omissions during closing arguments about which Petitioner complains are easily considered strategic decisions.  Because the letter was damaging to the defense, it was entirely reasonable for counsel not to emphasize it during his closing argument.  Similarly, counsel may not have objected to the prosecutor's comments about the letter during her rebuttal argument in order to avoid highlighting those comments to the jury, and, thus, focusing the jurors' attention upon damaging subject matter.  *See Butler v. Hosking*, No. 93-5976, 1995 WL 73132, at *9 (6th Cir. 1995).  To breach the unreasonableness threshold, "defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."  *Lundgren v. Mitchell*, 440 F.3d 754, 774–75 (6th Cir. 2006).  Conversely, "any single failure to object [to closing arguments] usually cannot be said to have been error."  *Id*. at 774; *see also Smith*, 591 F.3d at 522 (finding that defense counsel's failure to object to one instance of alleged prosecutorial misconduct was not deficient).  Therefore, counsel's failure to object to this aspect of the prosecution's closing argument falls within the broad range of reasonable trial conduct under *Strickland*.

F.    Presentation of inconsistent defenses

Petitioner contends that counsel was ineffective when he presented inconsistent defenses and theories at trial.  Counsel presented an alibi defense through the testimony of Petitioner and Rodney Milan.  Petitioner also argues that, through his cross-examination of the prosecutorial witnesses, defense counsel attempted to advanced a theory that Gormley opened the door and allowed Petitioner to enter the house and that nothing more than a fist fight took place between

- 30 -

Petitioner and Ramsdell.  Petitioner refers to this as the "invitation/mutuality" theory.  According to Petitioner, the "invitation/mutuality" theory directly conflicted with the alibi defense and suggested that Petitioner and Milan lied at trial.  Counsel also presented a theory that Ramsdell held a grudge against Petitioner for sleeping with his girlfriend and made the false allegations against Petitioner as payback, which Petitioner refers to as the "grudge theory."  (Tr. I, 90; Tr. II, 285.)[4]

Trial counsel's decision as to which theory or theories to advance at trial is a strategic choice that is accorded a high level of deference.  *See Davis v. Lafler*, 658 F.3d 525, 538 (6th Cir. 2011) (en banc).  Counsel for a criminal defendant may, in the exercise of his professional judgment, present inconsistent defense theories without running the risk that such tactics will later be deemed ineffective assistance of counsel.  *Brown v. Dixon*, 891 F.2d 490, 495 (4th Cir. 1989); *see also Singleton v. Lockhart*, 871 F.2d 1395, 1400 (8th Cir. 1989) ("There is nothing unusual about arguing inconsistent or alternative theories of defense.").  In this case, the alibi defense relied upon a finding by the jury that Petitioner did not enter Ramsdell's house. Given the testimony of three witnesses that Petitioner entered Ramsdell's home, it was entire reasonable for counsel to advance an alternative theory that Petitioner was invited into the house by Gormley.  In light of the evidence and the potential penalty faced by Petitioner as an habitual offender, gambling on an all-or-nothing defense could well have been less reasonable than arguing a fallback position in addition to a claim of total innocence.  Moreover, the "grudge" theory was compatible with both the alibi defense and the "invitation/mutuality" theory.  Petitioner, therefore, has not overcome the presumption that trial counsel's decision was grounded in trial strategy.  *See Strickland*, 466 U.S. at 689.

---

[4]Petitioner asserts that while counsel presented the "grudge" theory to the jury, he failed to present sufficient competent evidence to support the theory and failed to properly impeach or otherwise show the witnesses' biases and motive to lie.  This argument is duplicative of Petitioner's previous claims of ineffective assistance of counsel that were found to be without merit.

G.    <u>Failure to make key points during closing arguments</u>

Petitioner argues that defense counsel was constitutionally ineffective for failing to emphasize the following points during closing arguments: (1) the inconsistencies in the prosecutorial witnesses' statements and testimony; (2) the testimony of Petitioner's alibi witness; and (3) the fact that Petitioner maintained his innocence in the letter to Ramsdell.

Defense counsel's decision concerning what evidence to highlight during closing argument must be considered trial strategy. *See Chegwidden*, 92 F. App'x at 311. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it access counsel's competence with the benefit of hindsight. *Id*. Furthermore, the Court has reviewed defense counsel's closing argument and finds that counsel pursued a reasonable trial strategy given the evidence against Petitioner. Contrary to Petitioner's assertions, counsel spent considerable time during closing arguments pointing out material inconsistencies in the prosecutorial witnesses' statements and testimony. For counsel to mention each and every inconsistency in the prosecutorial witnesses testimony during closing arguments would have been neither practical nor productive. While counsel did not go over Rodney Milan's alibi testimony in detail, the first point he made during closing argument was that "Mr. Anderson was not there." (Tr. II, 283.) In addition, as previous discussed, counsel's decision not to draw attention to the letter during closing argument was reasonable trial strategy. Accordingly, counsel's performance during closing argument was not objectively unreasonable.

H.    <u>Cumulative error</u>

Finally, Petitioner asserts that the cumulative effect of defense counsel's errors violated his Sixth Amendment right to the effective assistance of counsel. Under the AEDPA, a

court only may grant habeas relief based on a misapplication of Supreme Court law.  *Bailey*, 271

F.3d at 655.  The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable

on habeas review.  "The Supreme Court has not held that constitutional claims that would not

individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo*, 302

F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams*

*v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004);

*Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).  Finally, because I concluded above that the

individual claims are without merit, Petitioner cannot show that the cumulative error violated his

constitutional rights.  *See Seymour*, 224 F.3d at 557.  Petitioner, therefore, is not entitled to habeas

corpus relief resulting from the performance his trial counsel.

## II.        **Ineffective Assistance of Appellate Counsel**

In his second ground for relief, Petitioner contends that his appellate counsel was

ineffective for failing to adequately present the claims that were raised on direct appeal, failing to

raise successful claims or "dead bang winners" that were later raised by Petitioner in his motion for

relief from judgment, and failing to move for a remand for a *Ginther* hearing.  Petitioner further

argues that appellate counsel performed so ineffectively and egregiously as to amount to a

constructive denial of counsel at a critical stage such that prejudice should be presumed under

*Cronic*.

The Sixth Amendment guarantees a defendant the right to effective assistance of

counsel in a first appeal of right.  *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *Douglas v. California*,

372 U.S. 353, 356–57 (1963).  The Supreme Court has repeatedly held that counsel's failure to

perfect a direct appeal that a defendant wishes to pursue is deficient performance.  *See Flores-*

*Ortega*, 528 U.S. at 470, 477 (2000) (counsel's failure to follow a defendant's instructions to file a

notice of appeal "cannot be considered a strategic decision"); *Evitts*, 469 U.S. at 394 ("the attorney must be available to assist in preparing and submitting a brief to the appellate court, and must play the role of an active advocate" (internal citation omitted)); *Rodriquez v. United States*, 395 U.S. 327, 329–30 (1969) (counsel erred by failing to file a notice of appeal).  In *Flores-Ortega*, the Supreme Court held that where counsel's deficient performance renders the desired direct appeal "entirely nonexistent," prejudice is presumed. 528 U.S. at 484.  "[W]hen counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal."  *Id.*

In the instant case, appellate counsel filed a twelve-page brief setting forth two claims of error.  Counsel argued that Petitioner was entitled to a new trial where the trial court denied his request for self-representation and that Petitioner was denied the effective assistance of counsel. Petitioner was granted leave to file a supplemental brief in which he argued the two claims raised by appellate counsel, as well as an additional claim that he was denied his Sixth Amendment right to confrontation.  While Petitioner contends that his appellate counsel inadequately presented claims and should have raised additional claims of error, Petitioner clearly was not denied his right of appeal. Consequently, the *Strickland* standard applies to Petitioner's claims of ineffective assistance of appellate counsel.

Petitioner contends that counsel failed to raise meritorious claims or "dead bang winners" on direct appeal.   An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745,

751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Petitioner cannot show prejudice resulting from counsel's alleged failure to raise meritorious issues on direct appeal.  Petitioner was granted leave to file a supplemental brief on direct appeal in which he could include any additional claims of error.  Moreover, this Court finds that Petitioner's claims for habeas relief are without merit.  Where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal.  *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. Feb. 26, 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit.");*Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal).  Because Petitioner's claims of ineffective assistance of trial counsel were without merit, counsel also was not deficient for failing to move for a remand for a *Ginther* hearing.  Accordingly, Petitioner is not entitled to habeas relief resulting from the performance of appellate counsel.

## III.     Right to Self-Representation

In his third ground for habeas corpus relief, Petitioner contends that the trial court violated his Sixth Amendment rights when it denied his request for self-representation.  In *Faretta*

*v. California*, 422 U.S. 806 (1975), the Supreme Court held that a criminal defendant has a Sixth Amendment right to self-representation. *Id*. at 836 ("In forcing *Faretta*, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense.").  When a defendant announces his unequivocal intention to assert his right to self-representation, the trial court must determine whether the defendant's decision to represent himself is knowing, intelligent, and voluntary.  *See id.* at 835 (noting that after a defendant requests to represent himself, the court "should [make] [the defendant] aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'" *quoting Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)); *see also Iowa v. Tovar,* 541 U.S. 77, 88–89 (2004) (noting that "before a defendant may be allowed to proceed *pro se*, he must be warned specifically of the hazards ahead" (second emphasis added)); *Patterson v. Illinois*, 487 U.S. 285, 298 (1988) (noting that the Supreme Court has "imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial").  A trial court's determination as to the propriety of a waiver of counsel should appear on the record.  *See Johnson v. Zerbst*, 304 U.S. 458, 465 (1938).

On the morning of the second day of trial, Petitioner told the court that his attorney had not sufficiently questioned the witnesses regarding inconsistencies in their statements and motives to give false testimony against Petitioner.  Consequently, Petitioner believed that he would be better off representing himself.  (Tr. II, 176-183.)  The trial court established that Petitioner had a GED and no relevant legal experience, and then advised Petitioner of the risks of self-representation.  Petitioner responded: "It's not something I want to do, your Honor; but, I mean, all

- 36 -

they have in this case is these people's test - what these people are saying.  And if I have no way to impeach that or, you know, show motive for them to lie, then I feel like I'm being deprived of my defense.  I don't want to have to represent myself.  I would definitely prefer not to."  (Tr. II, 193.) The trial court subsequently denied the request, stating:

> I determine from what you've said that your request to represent yourself is not unequivocal; and, therefore, I will deny the request.

> We'll bring the jury down and continue the trial.

> I'm also concerned that that defendant does not understand the risks of self-representation.  He's facing some serious consequences if he's convicted.  And what believes is relevant may not, from what I have seen thus far, be relevant.  Then we're going to end up wasting a lot of time in front of a jury debating over the relevancy of inconsequential evidence.

> Accordingly, I find that his request should be denied.  In that regard I have relied upon the following - I've relied upon either statutory or constitutional provisions, case law relating to Article I, Section 13, of the United States Constitution; MCL 763.1; MCR 6.005(A) and (D).  I have relied upon case law set forth in *People v. Anderson*, 398 Mich 361; *People v. Dennany*, 445 Mich 412.

> I have also determined that under the *Atkins* test and *Anderson* this waiver is not knowingly made; the waiver is not unequivocal.

> And I am further satisfied that the defendant does not fully understand the advantages and disadvantages of self-representation.

> I'm also concerned that self-representation in the middle of a trial that's already started will - it could become an undue inconvenience or burden.

> I think that the - my observation of Mr. Svikis's performance yesterday leads me to - to the conclusion that his cross-examination was appropriate and thorough. and any points that, certainly, I was willing to let him to go - go into venues and areas that may not always be available to most counsel, but that he laid appropriate foundations for doing so; and, therefore, I overruled prosecutorial objections for the most part.

(Tr. II, 193-95.)

Applying *Faretta* and analogous state-law requirements, the Michigan Court of Appeals concluded that the trial court did not violate Petitioner's Sixth Amendment right to self-representation.  The court stated:

> A criminal defendant's right to represent himself is implicitly guaranteed by the United States Constitution, US Const, Am VI, *Faretta v California*, 422 US 806; 95 S Ct 2525; 45 L Ed 2d 562 (1975), and explicitly guaranteed by the Michigan Constitution and state statute, Const 1963, art 1, § 13, and MCL 763.1.  However, the right is not absolute, and several requirements must be met before a defendant may proceed in propria persona.  *People v Anderson*, 398 Mich 361, 366-367; 247 NW2d 857 (1976).  The trial court must determine that the three factors set forth in *Anderson* are met before granting a defendant's request to represent himself: (1) the defendant's request must be unequivocal, (2) the defendant must assert his right knowingly, intelligently, and voluntarily after being informed of the hazards and drawbacks of self-representation, and (3) the defendant's self-representation must not unduly inconvenience the court and its proceedings.  *People v Willing*, 267 Mich App 208, 219; 704 NW2d 472 (2005), citing *Anderson, supra* at 367-368.
>
> Additionally, the trial court must comply with MCR 6.005.  *People v Ahumada*, 222 Mich App 612, 614; 564 NW2d 188 (1997). MCR 6.005(D) provides that a court may not permit the waiver of counsel without first:
>
> > (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and
> >
> > (2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

These requirements ensure that the defendant knowingly and intelligently waives counsel with open eyes.  *Ahumada, supra* at 614.  Every presumption should be made against waiver.  *Id.* at 617.  Whether a knowing and intelligent waiver of counsel exists depends on the particular circumstances of a case, including the defendant's background, experience, and conduct.  *Anderson, supra* at 370.  Although a defendant's general competence is relevant to whether he knowingly and intelligently asserts his right to self-representation, his legal competence is not. *Anderson, supra* at 368.

In the present case, the trial court properly denied defendant's request for self-representation.  Defendant made his request on the morning of the second day of trial.

When the trial court asked defendant if he was voluntarily giving up his right to counsel, defendant replied, "[t]hat's correct. Unless I can get another attorney." Additionally, defendant stated that representing himself was "not something I want to do," but he thought he had to represent himself to impeach the testimony of the prosecution's witnesses. Defendant also stated, "I don't want to represent myself. I would definitely prefer not to." We find that the trial court correctly ruled that defendant's request for self-representation was equivocal and involuntary. A trial court does not err in denying an equivocal request for self-representation. *Anderson, supra* at 367. Our review of the record indicates that defendant's chief complaints about counsel's representation stemmed from defendant's misunderstanding of Michigan's rules of evidence. While his legal competence was irrelevant to whether he knowingly and intelligently asserted his right to self-representation, *id.* at 368, we find it pertinent to whether his self-representation would unduly inconvenience or burden the court. Thus, the trial court properly ruled that defendant did not overcome the presumption against waiver of his right to representation by counsel. *Ahumada, supra* at 616-617.[1]

> [1]We additionally hold that the trial court did not abuse its discretion when it declined to appoint substitute defense counsel. Defendant has not properly presented this issue for appeal because he failed to raise it in his statement of questions presented. *People v Brown*, 239 Mich App 735,748; 610 NW2d 234 (2000). Nevertheless, we have reviewed the entire record and reject defendant's argument that he demonstrated good cause for the appointment of substitute counsel. Defendant did not demonstrate a legitimate difference of opinion between himself and his appointed counsel with regard to a fundamental trial tactic. *Traylor, supra* at 462. They both agreed to an alibi defense, and defense counsel adequately tested the credibility of the prosecution witnesses. Moreover, we find that substitution of counsel on the second day of this two-day jury trial would have unreasonably disrupted the judicial process. *Id.*

(MCOA Op. 1-2.)

"On habeas review, a court must 'indulge every reasonable presumption' against waiver of the right to counsel." *Jones v. Jamrog*, 414 F.3d 585, 596 (6th Cir. 2005) (quoting *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir. 2001)); *see also Brewer v. Williams*, 430 U.S. 387, 404 (1977). As discussed by the Michigan Court Appeals, Petitioner's request for self-representation was not unequivocal. Nevertheless, the trial court proceeded to conduct a *Faretta*-compliant inquiry on the record and concluded that the request was not made knowingly and intelligently. Furthermore, a trial court may exercise discretion to deny such a request when it is untimely. *See*

*Martinez v. Ct. of App. of Cal., Fourth App. Dist.*, 528 U.S. 152, 161-162 (2000). Although the Supreme Court has yet to elaborate on the exact point at which a request for self-representation is no longer timely, the Sixth Circuit and other federal circuit courts have held that a request for self-representation is timely if it is made prior to the time the jury is selected and sworn in unless the prosecution can demonstrate that the request is merely a delay tactic. *See United States v. Martin*, 25 F.3d 293, 295-96 (6th Cir. 1994); *Robards v. Rees*, 789 F.2d 379, 383 (6th Cir. 1986); *see also United States v. Bankoff*, 613 F.3d 358, 373 (3d Cir. 2010); *United States v. Young*, 287 F.3d 1352, 1354 (11th Cir. 2002); *United States v. Smith*, 780 F.2d 810, 811 (9th Cir. 1986); *Chapman v. United States*, 553 F.2d 886, 887 (5th Cir. 1977); *United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 16 (2d Cir. 1965). Petitioner did not make his request until the second day of a two-day trial, which clearly was untimely. Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of *Faretta*.

## IV.    Right to Present a Defense

In his fourth ground for relief, Petitioner contends that his due process rights to present a complete defense and to a fair trial were violated when the trial court forced him to continue trial with appointed counsel after Petitioner complained that counsel was failing to effectively cross-examine and impeach the witnesses and otherwise expose their motives for fabricating the charges against him. While Petitioner asserts a due process violation, he makes precisely the same arguments presented in his previous grounds for habeas corpus relief, which the Court found to be without merit. For the reasons set forth above, the Court cannot find a due process violation.

**Conclusion**

In light of the foregoing, the Court will dismiss Petitioner's application because it fails to raise a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service.

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Date:   <u>February 11, 2015</u>                     <u>/s/ Robert Holmes Bell</u>
                                                    ROBERT HOLMES BELL
                                                    UNITED STATES DISTRICT JUDGE